**Opinion issued June 30, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00481-CV

————————————

**BRANDY L. LISS, INDEPENDENT EXECUTOR OF THE ESTATE OF MARY JAMES, TRAVIS JAMES, AND BAY AREA SHOOTER'S CENTER LLC, Appellants/Cross-Appellees**

**V.**

**CUSHMAN & WAKEFIELD OF TEXAS, INC. (Appellee/Cross-Appellant), EDWARD NWOKEDI, TIN HO TSANG, AND CYRIL CHIOSA, Appellees**

---

**On Appeal from the 333rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-42093**

---

## MEMORANDUM OPINION

This case arises from a commercial real estate dispute. Appellants/cross-appellees Brandy L. Liss, independent executor of the estate of Mary James, Travis

James (collectively, "the Jameses"), and Bay Area Shooter's Center LLC appeal the summary judgments granted on their claims for breach of fiduciary duty, fraud, fraudulent inducement, statutory fraud, breach of contract, negligent misrepresentation, negligent hiring and supervision, civil conspiracy, and violations of the Deceptive Trade Practices Act ("DTPA")[1] in favor of appellees Cushman & Wakefield of Texas, Inc. ("C&W"), Edward Nwokedi, Tin Ho Tsang, and Cyril Chiosa. In its cross-appeal, C&W challenges the trial court's final judgment awarding a take-nothing judgment in favor of cross-appellees on C&W's counterclaim under the DTPA. We affirm in part and reverse and remand in part.

## Background

### A. The Parties

Mary James[2] ("Mary") owned The Arms Room, a gun store in Dickson, Texas, through Bay Area Shooter's Center LLC ("Bay Area"), a limited liability company. Travis James ("Travis") is her son. Edward Nwokedi ("Nwokedi") and Tin Ho Tsang ("Tsang") are C&W brokers (collectively, "the brokers"). Cyril Chiosa ("Chiosa") purchased The Arms Room in October 2017.

---

[1]    TEX. BUS. & COM. CODE ANN. §§ 17.41-.63.

[2]    In its brief on appeal, C&W states that Travis James's mother, Mary James, passed away during this litigation, and her daughter, Brandy Liss, is the executor-in-interest of her estate.

2

## B. The Listing Agreement

In June or July 2017, Nwokedi approached Mary, Travis, and their family about selling The Arms Room.  Bay Area and C&W subsequently entered into a Listing Agreement appointing C&W as Bay Area's sole agent with the exclusive right to sell the property.

The Agreement states, in relevant part:

. . . .

2.  Services.  C&W will use its efforts to obtain a satisfactory purchaser for the Property at a sale price to be determined by Owner and on such other terms as are acceptable to Owner.  C&W will negotiate the business terms of any purchase and sale agreement on behalf of Owner and in Owner's best interest, subject to Owner's review and final approval, except as otherwise directed by Owner.  C&W will cooperate with other licensed real estate brokers.

. . . .

7.  Representation of Purchasers.  Owner acknowledges and agrees that C&W may represent potential purchasers and consents to such dual representation, provided C&W timely discloses any such dual representation to Owner.

The "Schedule for Commissions for Sale" provides:

**AGENCY RELATIONSHIP DISCLOSURE: OWNER ACKNOWLEDGES THAT C&W MAY REPRESENT POTENTIAL PURCHASERS AND OWNER HEREBY CONSENTS TO SUCH INTERMEDIARY REPRESENTATION.** As a real estate broker who acts as an intermediary in a transaction, C&W (i) shall treat all parties honestly; (ii) may not disclose that the seller will accept a purchase price less than the asking price unless authorized in writing to do so by the seller; (iii) may not disclose that the purchaser will pay a purchase price greater than the purchase price

3

submitted unless authorized in writing to do so by the purchaser; and (iv) may not disclose any confidential information or any information that a party specifically instructs C&W in writing not to disclose unless authorized in writing to disclose the information or required to do so by the Texas Real Estate License Act or by a court order or if the information materially relates to the condition of the Property.

## C. Appellants' Petition

The Jameses filed their original petition on July 15, 2020. Bay Area joined the suit on October 12, 2020. In their fifth amended petition—the live pleading—appellants alleged that Nwokedi represented to them that he could sell The Arms Room for approximately $14 million. However, instead of negotiating a sale that was in appellants' best interests, Nwokedi partnered with his friend, Chiosa, and fellow C&W broker, Tsang, to purchase The Arms Room for a significantly reduced price. Together, Nwokedi, Tsang, and Chiosa formed CEL Arms Room Partners, LLC ("CEL").

Appellants alleged that Nwokedi, Tsang, and Chiosa convinced them initially to sell the business for $10 million and later to reduce the sales price to $7.5 million. Appellants alleged that before closing, Chiosa, through Nwokedi and Tsang (collectively, "the buyers"), also convinced them to loan $800,000 to Chiosa for the purchase of The Arms Room. However, instead of the proposed loan, Chiosa later persuaded appellants to reduce the sales price by $800,000 in exchange for a fifteen percent ownership in CEL, the company that purportedly owned the real estate.

4

They alleged that, despite representations to the contrary, CEL did not, in fact, own the real property; instead, it was a company with no tangible assets.

Appellants asserted the following claims in their fifth amended petition:

- Breach of Fiduciary and Statutory Duties as to C&W, Nwokedi, and Tsang

- Fraud/Fraudulent Inducement as to C&W, Nwokedi, Tsang, and Chiosa

- Statutory Fraud as to C&W, Nwokedi, Tsang, and Chiosa

- Breach of Contract as to C&W, Nwokedi, and Tsang

- Negligent Misrepresentation as to C&W, Nwokedi, Tsang, and Chiosa

- Negligent Hiring and Negligent Supervision as to C&W

- Civil Conspiracy as to C&W, Nwokedi, Tsang, and Chiosa

- DTPA Violations as to C&W, Nwokedi, and Tsang

Appellants asserted several liability theories against C&W, namely, respondeat superior, statutory liability, vicarious liability, ostensible agency, ratification, and vice principal liability.

In its third amended answer, C&W asserted a counterclaim against appellants for asserting a bad faith claim under the DTPA. It argued that appellants' DTPA claim was groundless in law or brought in bad faith and that as such, it was entitled to recover reasonable and necessary attorney's fees and court costs in defense of the claim.

## D. Summary Judgment Proceedings

C&W moved for summary judgment on appellants' claims in August 2021. It argued that Bay Area could not bring suit because it was a forfeited company and its individual members could not sue on its behalf. It further asserted that even if Bay Area could maintain suit, its claims were barred by the statute of limitations because it was not added as a party until October 12, 2020. It argued that its tort claims against C&W for breach of fiduciary duty, negligent misrepresentation, negligent hiring and supervision, and civil conspiracy were barred by the two-year statute of limitations. As to the Jameses' claims, C&W argued that because the parties to the Listing Agreement were Bay Area and C&W, the Jameses lacked privity of contract and could not assert a breach of contract claim against C&W, and as individuals, they lacked standing to sue on behalf of Bay Area. C&W argued that to the extent the Jameses had asserted a fraud claim against C&W, that claim should also be dismissed because any alleged misrepresentations were made to Bay Area, and not the Jameses. C&W attached as summary judgment evidence appellants' fifth amended petition and Bay Area's forfeiture of its tax charter. Nwokedi and Tsang joined and adopted C&W's summary judgment motion.

Nwokedi moved for summary judgment on Bay Area's claims arguing that because the Texas Secretary of State had forfeited Bay Area's charter, certificate of formation, and registration prior to the filing of appellants' lawsuit, Bay Area lacked

6

capacity to sue. C&W, Tsang, and Chiosa joined and adopted Nwokedi's summary judgment motion against Bay Area.

In its summary judgment response to C&W's and Nwokedi's motions for summary judgment, appellants argued that Bay Area was authorized to bring suit against the appellees, despite the fact that it no longer existed, because Texas Business Organizations Code section 11.356 provides that a forfeited entity continues in existence for up to three years to prosecute an action in its name until all judgments, orders, and decrees have been fully executed. Because Bay Area filed suit within the three-year period, it had the capacity to bring suit against appellees. Appellants asserted that appellees misstated the law regarding breach of fiduciary duty and civil conspiracy. Contrary to appellees' assertion, they argued the statute of limitations for breach of fiduciary duty is four years, not two years. And, civil conspiracy, which is a derivative tort, does not have its own limitations period; rather, the limitations period for conspiracy is tied to the underlying tort upon which the conspiracy claim is premised. Appellants further argued that the discovery rule and doctrine of fraudulent concealment applied in this case. Because they did not become aware of any potential negligence until April 2019, at the earliest, and likely not until May or June 2019, they argued the limitations period for their negligence-based claims did not accrue until April 2019 and did not expire until April 2021, well after Bay Area filed suit on October 12, 2020. They also asserted that when

7

suit is brought in the name of one plaintiff for the benefit of another, the substitution of the new plaintiff is not the beginning of a new suit. Thus, they argued, because Mary and Travis brought suit for the benefit of Bay Area, the company's appearance on October 12, 2020 was not time barred. Lastly, appellants asserted that courts generally allow parties to correct a misnomer as long as it is not misleading. They argued that the addition of Bay Area to the suit was not misleading to appellees and limitations was tolled. Appellants' summary judgment evidence included a November 30, 2017 email from Nwokedi to Chiosa, a C&W investment summary, the Listing Agreement between C&W and Bay Area, and the sworn Declaration of Travis James. In his declaration, Travis stated:

> In or around June or July 2017, my family was approached by Edward Nwokedi about selling the Arms Room, a business which was owned by my mother, Mary James, through Bay Area Shooters, LLC. Mr. Nwokedi told me that he could sell the business for $15,000,000 and bragged about his experience as a broker. As the Executive Director of Cushman & Wakefield of Texas, Inc., Mr. Nwokedi also told me about the good reputation of Cushman. Based on the representations of Mr. Nwokedi, the reputation of Cushman, Mr. Nwokedi's position within Cushman, and the promise to sell the business for around $15,000,000, Bay Area entered into a listing agreement with Cushman effective on August 1, 2017 (the "Listing Agreement") naming it as Bay Area's broker in the sale the Arms Room.

> Reasonably soon after entering into the Listing Agreement, Mr. Nwokedi informed Mary James, myself, and my family that he had a likely buyer for the business. The buyer's name was Cyril Chiosa. Mr. Nwokedi provided us with an Offer to Purchase from Mr. Chiosa in or around early October 2017, which was significantly below the $15,000,000 that Mr. Nwokedi had told us he could sell the business for. Mr. Nwokedi represented to us that he thought this was the best possible offer for the Arms Room based on his vast experience as a broker with Cushman. After much thought and believing Mr.

8

Nwokedi and Cushman's representations about the offer, and that time was of the essence, Mary James signed the offer on October 3, 2017.

After signing the offer, despite Mr. Nwokedi's representations, some significant delays occurred while Mr. Chiosa attempted to get financing. Because of this, the family asked Mr. Nwokedi and Cushman several times if there were other individuals willing to purchase the business. In fact, the family provided Mr. Nwokedi and Cushman contact information for other potential buyers. Every time, however, Mr. Nwokedi stated that this was the best possible and only deal available. Also during this time, Mr. Chiosa and his attorney, Timothy J. Heinrich, made several revisions to the deal documents, which Mr. Nwokedi stated was standard in these transactions.

Then, at some point in April or May 2018, Mr. Nwokedi informed us that he and Tin Ho Tsang, another Cushman broker, would be joining Mr. Chiosa in purchasing the Arms Room. At the time, Mr. Nwokedi and Mr. Tsang's involvement did not raise many alarms considering the deal was supposed to close soon. The concern about financing even seemed to be alleviated because, from my perspective, Mr. Nwokedi and Mr. Tsang's involvement would hopefully cure those issues and the deal would close.

After Mr. Nwokedi and Mr. Tsang informed me they would become purchasers, in or around May or June 2018, Mr. Nwokedi approached me regarding transitioning the $800,000 loan into equity for myself into the new company that owned the real estate. Mr. Nwokedi also represented to me that Mr. Chiosa would not move forward with the sale unless the $800,000 loan was transitioned to equity. In a phone call, Mr. Chiosa and Mr. Nwokedi convinced me to proceed with the transition to equity because of the personal ownership interest in the limited liability company that owned the real estate and that we all would become partners in the success of the business. These representations made sense to me because $800,000 represented roughly 15% of the purchase price based on the value of the real estate. Again, I believed Mr. Chiosa and Mr. Nwokedi's representations about the ownership interest and partnership and agreed to transition the $800,000 loan for an interest in the limited liability company that owned the real estate. I also relied upon the Sixth Amendment which granted me an ownership interest in the company that owned the real estate.

Based on my new ownership interest, I understood that the parties were aligned and therefore relied on the advice of Mr. Nwokedi, Mr. Tsang,

Cushman, and Mr. Chiosa. Mr. Chiosa, Mr. Nwokedi, and Mr. Tsang's purchase of the Arms Room finally occurred on or around July 16, 2018. After the Arms Room sold, I remained employed with the Arms Room and managed the business operations. Mr. Chiosa, Mr. Nwokedi, and Mr. Tsang hired others to handle the accounting and finance aspects of the business.

Almost a year later on March 19, 2019, with taxes due soon, I requested my K-1 from Mr. Nwokedi. The March 19, 2019 email is attached hereto as Exhibit 1 and is a true and correct copy of the original. In response, Mr. Nwokedi told me that he would email the K-1 on March 21, 2019. *See* Ex. 1. I did not receive my K-1 on March 21, 2019. After not receiving the K-1 for a month, on April 16, 2019, I again asked [] Mr. Nwokedi when I could expect my K-1. The April 16, 2019 email is attached hereto as Exhibit 2 and is a true and correct cony of the original. I eventually received the K-1 which showed that I did not own a percentage of the company that owned the real estate. At this time, I realized that something was wrong.

Based on the K-1 and lack of ownership interest, I investigated further into the deal documents in or around May or June 2019. After review of the documents and for the first time, I learned that I did not in fact own a percentage of the limited liability company that owned the real estate. Rather, I owned a percentage of a limited liability company that owned the management company for the Arms Room, which was essentially worthless. Before April 2019, I had no reason to question whether the representations made to me were true and correct because I relied on Mr. Nwokedi, Mr. Tsang, and Cushman as my brokers in this transaction.

C&W filed a reply in support of its motion for summary judgment against Bay Area. It asserted that a forfeited entity like Bay Area is entitled to, at most, defensive relief, and that absent a repayment of its delinquent fees and resurrection of its charter, affirmative relief is barred. It argued that even if Bay Area were allowed to maintain its suit, it had not filed claims against C&W until more than two years after the real estate transaction closed. Thus, Bay Area's tort claims, which were subject to a two-year limitation period, should be dismissed. C&W further argued that

appellants had not pleaded the discovery rule. It objected to appellants' reliance on the discovery rule and further argued C&W had not tried that counter-defense by consent. Contrary to appellants' assertion, C&W argued that the addition of Bay Area as a party was not a matter of a simple misnomer or misidentification; rather, this was an effort by individual members of a defunct company to make an end run around the fact their company was forfeited. Additionally, they argued that Mary and Travis had not brought the suit "for the benefit of" Bay Area, as they alleged, as evidenced by their original petition and their live pleading. Finally, C&W argued that appellants had admitted away their case against C&W because Travis's declaration attached to their summary judgment response acknowledged that appellants knew Nwokedi and Tsang were working on both sides of the transaction before the deal closed and they agreed to work with them, anyway. C&W asserted that the only remaining facts alleging malfeasance concerned whether Travis has been misled about his ownership interest in CEL Arms Room Holdings, LLC, which had nothing to do with C&W or any brokerage services.

On October 26, 2021, the trial court held a hearing on C&W's and Nwokedi's motions for summary judgment. That same day, the trial court signed an order granting C&W's motion for summary judgment. One week later, on November 3, 2021, the trial court entered an order, stating:

> On October 26, 2021, this Court heard oral argument on Defendant Cushman & Wakefield of Texas, Inc.'s Motion for Summary Judgment ("the C&W

11

MSJ") filed on August 12, 2021" [and] Defendant, Edward Nwokedi's Motion for Summary Judgment (the "Nwokedi MSJ"), filed on August 5, 2021, which was joined by:

- co-Defendant Edward Nwokedi on August 12, 2021 ("Nwokedi Joinder of the C&W MSJ"); and

- co-Defendant Tin Ho "Lucas" Tsang on August 20, 2021 ("Tsang Joinder of the C&W MSJ").

This Court also heard oral argument on Defendant, Edward Nwokedi's Motion for Summary Judgment (the "Nwokedi MSJ"), filed on August 5, 2021, which was joined by:

- co-Defendant Cushman & Wakefield of Texas, Inc. on August 10, 2021 ("C&W Joinder of the Nwokedi MSJ");

- co-Defendant Tin Ho "Lucas" Tsang on August 9, 2021 ("Tsang Joinder of the Nwokedi MSJ"); and

- co-Defendant Cyril Chiosa on September 9, 2021 ("Chiosa Joinder of the Nwokedi MSJ").

After review of the C&W MSJ and the Nwokedi MSJ, all responses, replies, and joinders to those responses and replies thereto, and hearing all argument of counsel, the Court:

- **ORDERS** that the C&W MSJ, the Nwokedi Joinder of the C&W MSJ, and the Tsang Joinder of the C&W MSJ are **GRANTED;** and the Court further

- **ORDERS** that the Nwokedi MSJ, the C&W Joinder of the Nwokedi MSJ, the Tsang Joinder of the Nwokedi MSJ, and the Chiosa Joinder of the Nwokedi MSJ are **GRANTED.**[3]

---

[3] In their briefing, the parties disagree about which summary judgment motions the trial granted in its October 26 and November 3 orders. Prior to the filing of Nwokedi's and C&W's Motions for Summary Judgment in August 2021, C&W separately moved for summary judgment in 2020 on September 25, October 9, and

Following the trial court's ruling, the only claim that remained was C&W's counterclaim against appellants under the DTPA.

Appellants moved for reconsideration of the trial court's summary judgment rulings and for new trial or, in the alternative, for modification of its orders to reflect that the orders were final, appealable, and disposed of all claims and parties to the litigation. They attached to their motion the same exhibits filed with their summary judgment response.

C&W responded to appellants' motion arguing that it merely rehashed the arguments made in appellants' summary judgment response. It argued that Travis's admission in his declaration that he knew C&W's brokers, Nwokedi and Tsang, were on both sides of the real estate transaction conceded appellants' case. C&W asserted that its live DTPA counterclaim against appellants prevented the orders from being

October 15. We disagree with C&W that its motions for summary judgment, filed in 2020, were also granted by the trial court in its October 26 and November 3 orders. While the October 26 order does not identify which motions the trial court granted, the November 3 order expressly states that the trial court granted C&W's August 12, 2021 motion and Nwokedi's August 5, 2021 motion. During the October 26, 2021 hearing, the court also stated, and the parties agreed, that only two motions for summary judgment were before the court: Nwokedi's August 5 motion and C&W's August 12 motion. C&W has not pointed to any order disposing of its earlier filed summary judgment motions or to any record cite indicating those motions were heard or disposed of by the trial court. Thus, because only the August 5 and August 12, 2021 motions were before the trial court and granted, we may only consider the arguments raised in those motions in our review of the parties' issues. *See Casso v. Brand*, 776 S.W.2d 551, 553 (Tex. 1989) ("[I]ssues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal.") (citing TEX. R. CIV. P. 166a(c)).

13

final and appealable, and that it was nonsuiting its counterclaim to make the signed orders final and appealable, and modification was unnecessary. It asserted that appellants' discovery abuse provided an independent ground for dismissal, noting the trial court had the inherent authority under Texas Rule of Civil Procedure 215 to dismiss appellants' claims on this basis. Nwokedi, Tsang, and Chiosa joined and adopted C&W's response.

In their reply brief, appellants argued that contrary to appellees' assertion, they never contended that Travis had learned of Nwokedi's and Tsang's involvement with the buyer, Chiosa, until after the real estate transaction closed. While they conceded they had learned of their involvement before closing, appellants argued they had learned of such involvement only shortly before the closing and that Nwokedi and Tsang had not disclosed their earlier involvement. They argued that no courts have held that a real estate broker can act as the seller's agent and the buyer in a real estate transaction without informing his client, i.e., breaching his fiduciary duties of candor and full disclosure only to reveal that fact immediately before the closing date. They argued that C&W ignored the fact that Nwokedi, Chiosa, and Tsang lied to Travis about the nature of his ownership interest in CEL Arms Room Holdings, LLC. Appellants asserted that the purported "admission" C&W claimed "destroyed" appellants' theory was nothing more than a red herring. Finally, they

14

argued that C&W's allegation that appellants' discovery abuse provided an independent ground for dismissal was meritless.

Chiosa filed a motion for summary judgment against appellants which "[was] the same as [C&W]'s Motion for Summary Judgment which [the trial court] ha[d] already granted." Appellants responded to Chiosa's motion, re-urging the same arguments raised in their summary judgment response to C&W's motion for summary judgment. Chiosa filed a summary judgment reply that mirrored C&W's summary judgment reply in support of its motion for summary judgment against Bay Area. The trial court granted Chiosa's motion for summary judgment on August 23, 2022, dismissing all asserted claims against him.

One year later, on May 30, 2023, after conducting a bench trial on C&W's counterclaim against appellants under the DTPA—the sole remaining claim—the trial court issued a take-nothing judgment in favor of appellants and against C&W on its counterclaim "disposing of all claims and parties."

This appeal followed.

## I. Main Appeal

Appellants contend that the trial court erred in granting summary judgment in favor of appellees on their claims. First, they assert that appellees' argument that Bay Area lacked capacity to sue because it forfeited its corporate charter before filing suit is incorrect. Second, they argue Bay Area brought several claims that have a

four-year statute of limitations, not two years as appellees assert, and appellees acknowledged that Bay Area's fraud claim was timely. Third, appellants assert that the line of cases relied upon by appellees in the trial court to argue that Mary and Travis had no individual claims against appellees has been explicitly overruled. However, even if they had not, appellants' pleadings alleged conduct that specifically targeted Mary and Travis, not just Bay Area. Fourth, C&W's argument that it has no vicarious liability for the brokers' conduct is insufficient to support summary judgment because C&W did not attack all of the theories of liability in appellants' fifth amended petition, and they provided no evidence regarding the scope of the brokers' duties or employment with C&W to support their position that the brokers' actions were outside the scope of their employment. Finally, they argue the economic loss rule does not apply to this case because (1) the claims asserted in the live pleading stem from duties outside of the brokers' employment, and (2) the damages sought are different than the expectancy damages flowing from the failure to perform the contract.

## A. Standard of Review

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference

16

and resolve any doubts in the non-movant's favor. *Valence Operating*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the asserted grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

To prevail on a traditional summary judgment motion, the movant must establish that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a defendant moves for traditional summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action, or (2) plead and conclusively establish each essential element of an affirmative defense, thereby defeating the plaintiff's cause of action. *See Cathey*, 900 S.W.2d at 341; *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). Once the movant meets its burden, the burden shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment. *See Siegler*, 899 S.W.2d at 197; *Transcon. Ins. Co. v. Briggs Equip. Trust*, 321 S.W.3d 685, 691 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The evidence raises a genuine issue of fact if reasonable and fair-minded fact finders could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

To prevail on a no-evidence summary judgment motion, the movant must establish that there is no evidence to support an essential element of the non-movant's claim on which the non-movant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the non-movant to present evidence raising a genuine issue of material fact as to each of the elements challenged in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn*, 321 S.W.3d at 524. A no-evidence summary judgment may not be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements in the motion. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (internal quotations omitted). The trial court must grant a no-evidence summary judgment motion if the movant asserts that there is no evidence of one or more specified elements of the non-movant's claim on which the non-movant would have the burden of proof at trial and the non-movant fails to file a timely response or fails to produce summary judgment evidence raising a genuine issue of material fact on each challenged element. *See* TEX. R. CIV. P.

18

166a(i); *Lockett v. HB Zachry Co.*, 285 S.W.3d 63, 67 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

Summary judgments may only be granted upon grounds expressly asserted in the summary judgment motion. *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (citing TEX. R. CIV. P. 166a(c) and *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex. 1993)). Granting summary judgment on a claim not addressed in the summary judgment motion is, as a general rule, reversible error. *G & H Towing*, 347 S.W.3d at 297.[4]

## B. Bay Area's Capacity to Sue

In their motions for summary judgment, appellees argued that Bay Area could not bring suit against them because the Texas Secretary of State forfeited Bay Area's charter, certificate of formation, and registration prior to the filing of appellants' lawsuit. Relying on Texas Tax Code section 171.252(1),[5] appellees argued that companies that are no longer active can neither sue nor defend themselves. In

---

[4]    Courts have recognized a limited exception to the general rule and affirmed summary judgments, even when the underlying motion omitted one of multiple causes of action, "when the omitted ground was intertwined with, and precluded by, a ground addressed in the motion." *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011); *see Wendt v. Moore*, No. 01-23-00128-CV, 2024 WL 3528437, at *12 (Tex. App.—Houston [1st Dist.] July 25, 2024, no pet.) (mem. op.).

[5]    TEX. TAX CODE ANN. § 171.252.

support of their motion, appellees attached as summary judgment evidence appellants' fifth amended petition and Bay Area's forfeiture of its tax charter.

In their summary judgment response, as on appeal, appellants argued that Bay Area was authorized to bring suit against the appellees—despite the fact that it had forfeited its charter with the State for failure to pay taxes—because Section 11.356 of the Texas Business Organizations Code provides that a forfeited entity continues in existence for up to three years to "prosecut[e] or defend[], in its own name, a legal action brought by or against it." Thus, they argue, Bay Area had capacity to bring its claims against appellees because when it filed suit in October 2021, Bay Area was within the three-year grace period provided by that statute.

Relevant here, Texas Tax Code section 171.251(2) provides that a corporation forfeits its corporate privileges if it fails to timely pay its franchise tax.[6] *See* TEX.

---

[6]    Section 171.251 provides:

The comptroller shall forfeit the corporate privileges of a corporation on which the franchise tax is imposed if the corporation:

   (1) does not file, in accordance with this chapter and within 45 days after the date notice of forfeiture is mailed or provided by electronic means, a report required by this chapter;

   (2) does not pay, within 45 days after the date notice of forfeiture is mailed or provided by electronic means, a tax imposed by this chapter or does not pay, within those 45 days, a penalty imposed by this chapter relating to that tax; or

20

TAX CODE ANN. § 171.251(2). Under section 171.252, "if the corporate privileges of a corporation are forfeited under this subchapter . . . the corporation shall be denied the right to sue or defend in a court of this state." *Id.* § 171.252(1); *Manning v. Enbridge Pipelines (E. Tex.) L.P.*, 345 S.W.3d 718, 723 (Tex. App.—Beaumont 2011, pet. denied). When a corporation pays any delinquent taxes, the corporation regains its ability to sue and defend in Texas state courts. *G. Richard Goins Constr. Co., Inc. v. S.B. McLaughlin Assocs., Inc.*, 930 S.W.2d 124, 128 (Tex. App.—Tyler 1996, writ denied). "Once the right to sue or defend is revived, the corporation may sue or defend all causes of action, regardless of whether such causes arose before or during the period of forfeiture." *Id.* (citing *Fed. Crude Oil Co. v. State*, 169 S.W.2d 283, 285 (Tex. Civ. App.—Austin 1943, writ ref'd)). The issue of whether a corporation can sue after its corporate charter is forfeited is an issue of capacity. *See Transam. Corp. v. Braes Woods Condo Ass'n, Inc.*, 580 S.W.3d 733, 736 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("At the time it filed suit, Transamerica had forfeited its corporate charter due to nonpayment of taxes. Therefore, it lacked capacity to sue.") (citing TEX. TAX CODE ANN. § 171.252(1); *Ross Amigos Oil Co.*

---

(3) does not permit the comptroller to examine under Section 171.211 the corporation's records.

TEX. TAX CODE ANN. § 171.251.

21

*v. State*, 138 S.W.2d 798, 800 (1940); *El T. Mexican Rests., Inc. v. Bacon*, 921 S.W.2d 247, 250 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

The summary judgment evidence shows that Bay Area forfeited its corporate charter on August 2, 2019. Appellants do not contend, nor does the summary judgment record show, that Bay Area regained its corporate privileges, including the right to sue and defend in Texas courts, by paying its tax debt. Appellants acknowledge the general rule under Texas Tax Code section 171.251 that an entity whose charter has been forfeited lacks capacity to sue or defend itself in Texas courts. They assert, however, that Texas Business Organizations Code section 11.356(a) provides an exception to the general rule regarding forfeited charters.

The current version of section 11.356, entitled "Limited Survival After Termination," provides:

> (a) Notwithstanding the termination of a domestic filing entity under this code or the Tax Code, the terminated filing entity continues in existence until the third anniversary of the effective date of the entity's termination only for purposes of:
>
> > (1) prosecuting or defending in the terminated filing entity's name an action or proceeding brought by or against the terminated entity[.]

TEX. BUS. ORGS. CODE ANN. § 11.356. Appellants argue that section 11.356 authorizes a limited right of survival which Texas courts hold applies to cases like this one. Bay Area forfeited its corporate status on August 2, 2019, and it joined the suit on October 12, 2020. Thus, because Bay Area filed suit within the three-year

22

period following forfeiture of its corporate charter, Bay Areas argues it had capacity to file suit against appellees.

In response, appellees argue that appellants rely on a survival statute that stems from the Business and Organizations Code. They point to the language of Business Organizations Code section 11.356 as it existed at the time of final judgment, which provided: "Notwithstanding the termination of a domestic filing entity *under this chapter*, the terminated filing entity continues in existence until the third anniversary of the effective date of the entity's termination only for purposes of: (1) prosecuting or defending in the terminated filing entity's name an action or proceeding brought by or against the terminated entity . . . ." TEX. BUS. ORGS. CODE ANN. § 11.356 (emphasis added) (amended by Acts 2023, 88th Leg., ch. 27 (S.B. 1514), § 19, eff. Sept. 1, 2023). Appellees argue that because Bay Area was terminated under the Tax Code, not the Business and Organizations Code, the Tax Code applies here.[7] We agree.

With exceptions not relevant here, Texas Government Code section 311.031 states that "the reenactment, revision, amendment, or repeal of a statute does not

---

[7]    Appellees note that a corporation's charter can be terminated for different reasons under the Business and Organizations Code versus the Tax Code. The chapter of the Business and Organizations Code upon which appellants rely contemplates "the winding up of a domestic entity," *see* BUS. ORGS. CODE ANN. § 11.051–.059, a terminated entity, *see id.* § 11.191–.105, a revoked entity from a voluntary or judicial windup, *see id.* §§ 11.151–.153, 11.301–.315, or a claim resolution, *see id.* § 11.351–.359.

affect . . . (1) the prior operation of the statute or any prior action taken under it . . . ." TEX. GOV'T CODE ANN. § 311.031. The Legislature's adoption of these general savings provisions indicates a general legislative policy that the repeal or amendment of any statute shall not affect the prior operation of the statute nor extinguish any liability incurred or affect any right accrued or claim arising before the repeal or amendment takes effect. *See Bates v. Tesar*, 81 S.W.3d 411, 428 (Tex. App.—El Paso 2002, no pet.) (citing *Quick v. City of Austin*, 7 S.W.3d 109, 128 (Tex. 1998)); *see also Hous. Indep. Sch. Dist. v. Hous. Chron. Publ. Co.*, 798 S.W.2d 580, 585 (Tex. App.—Houston [1st Dist.] 1990, writ denied) ("Amendments are . . . presumed not to apply retroactively."). The version of section 11.356 in existence at the time the trial court rendered the final judgment offered a survival right only for "the termination of a domestic filing entity under *this chapter*." Acts 2023, 88th Leg., ch. 27 (S.B. 1514), § 19, eff. Sept. 1, 2023) (emphasis added). The amendment, which became effective on September 1, 2023—after the trial court entered its final judgment—broadened the scope of the section by changing that language to provide that the three-year survival period applies to a domestic filing entity terminated "under this code *or the Tax Code*." TEX. BUS. & ORGS. CODE ANN. § 11.356 (current version) (emphasis added).

Appellants acknowledge that the current version of section 11.356 was not in effect when the trial court issued its final judgment. They argue, however, that "the

24

Legislature's clarification of the statute sheds light on the meaning of the previous version," and the Legislature revised the statute to clarify that section 11.356 of the Business Organizations Code "has always granted a limited right of survival to entities terminated *under the Tax Code*." (Emphasis added). This argument is unavailing.

A statute is presumed to be prospective in its operation unless expressly made retrospective. TEX. GOV'T CODE ANN. § 311.022. Statutes are only applied retroactively if the statutory language indicates that the Legislature intended that the statute be retroactive. *In re M.C.C.*, 187 S.W.3d 383, 384 (Tex.2006); *see In re R.D.W.*, No. 11-09-00112-CV, 2010 WL 2863206, at *2 (Tex. App.—Eastland July 22, 2010, no pet.) ("Absent express language indicating that the legislature intended retrospective application, we must presume that the amended version of Section 61.079 does not apply here."). Nothing in the statute suggests the Legislature intended the amendment to apply retroactively.

Appellants also argue that section 11.001 of the Business and Organizations Code defines "terminated entity" to include "a domestic entity the existence of which has been . . . forfeited pursuant to the Tax Code, unless the forfeiture has been set aside." TEX. BUS. & ORGS. CODE ANN. § 11.001. They argue this definition is sufficient to bring entities terminated under the Tax Code within the reach of section 11.356's limited survival right because the definition reflects the Legislature

25

explicitly included terminations under the Tax Code. Appellants' argument is misplaced. That the definition of "terminated entity" in section 11.001 includes an entity that has been forfeited under the Tax Code does not permit us to read language into section 11.356 the Legislature did not include.[8] *See Cadena Com. USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325–26 (Tex. 2017) (citing *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("We presume the Legislature 'chooses a statute's language with care, including each word

---

[8] At oral argument, appellants cited *Anemelu v. Iraheta*, No. 14-19-00018-CV, 2020 WL 3719666 (Tex. App.—Houston [14th Dist.] July 7, 2020, no pet.) (mem. op.) in support of their argument that section 11.356's limited survival statute applies to Bay Area and permitted the filing of its suit in this case. In *Anemelu*, a limited liability company's corporate charter was forfeited pursuant to section 171.309 of the Texas Tax Code. *See id.* at *3. The trial court concluded that the forfeiture precluded the company from pursuing any claims after the date of forfeiture. *See id.* The Fourteenth Court of Appeals disagreed, noting that Business Organizations Code section 11.356 granted a three-year reprieve for the company to pursue its claims after the termination of its corporate charter. *See id.*

We do not find *Anemeleu* persuasive. *Anemelu* applied the former version of section 11.356 without discussing the language limiting the scope of the section to domestic filing entities terminated "under this chapter." The court relied on the holdings in *In re Brothers Oil & Equipment, Inc.*, No. 03-17-00349-CV, 2017 WL 3902617 (Tex. App.—Austin Aug. 22, 2017, orig. proceeding) (mem. op.) and *Cohen Acquisition Corp. v. EEPB, P.C.*, No. 14-14-00330-CV, 2015 WL 2404869 (Tex. App.—Houston [14th Dist.] May 19, 2015, pet. denied) (mem. op.), but the courts' statements in those cases concerning the impact of section 11.356 on terminated entities were not necessary to the disposition of the cases and thus constituted dicta, which is not binding as precedent. *See Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 399 (Tex. 2016); *Demerson v. Smith*, 695 S.W.3d 853, 864 (Tex. App.—Houston [1st Dist.] 2024, pet denied). In short, neither *Anemelu* nor *In re Brothers Oil* and *Cohen Acquisition* addressed the question before us. We thus decline to follow them.

chosen for a purpose, while purposefully omitting words not chosen.'")). We must take statutes as we find them and refrain from rewriting the Legislature's text. *Entergy Gulf States v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009). When the Legislature uses a word or phrase in one part of a statute but excludes it from another, the term should not be implied where it has been excluded. *See Cadena Com. USA*, 518 S.W.3d at 329.

Bay Area was terminated under the Tax Code, and not the Business and Organizations Code, which means that it was not terminated under "this chapter" as the prior version of section 11.356 in effect at the time required. Consequently, Bay Area was not authorized to bring suit against appellees under section 11.356's survival statute. Because it did not have capacity to sue appellees, the trial court properly dismissed Bay Area's claims against appellees.[9]

## C. The Jameses' Individual Claims

Appellants contend that the Jameses sufficiently pleaded individual claims against appellees for breach of fiduciary duties, fraud, fraudulent inducement, statutory fraud, breach of contract, negligent misrepresentation, negligent hiring and supervision, civil conspiracy and claims under the Deceptive Trade Practices Act.

---

[9] Because we have concluded that Bay Area did not have capacity to sue appellees, we do not reach appellants' argument that appellees were not entitled to summary judgment against Bay Area based on limitations.

27

They argue that although Bay Area signed the Listing Agreement, their live pleading asserts that appellees engaged in wrongful conduct that specifically targeted the Jameses individually: misrepresenting the agreement and swindling Travis out of $800,000.

Appellees respond that any claims under the Listing Agreement or involving alleged representations made to Bay Area belong to Bay Area, not the Jameses individually. They argue that the counterparty to the Listing Agreement was Bay Area, and corporate formalities should be respected. The Jameses cannot step into Bay Area's shoes and assert claims on behalf of the forfeited entity.

We first address appellees' contention that the Jameses lacked standing to sue appellees.[10]

### 1. Applicable Law

Standing requires "a real controversy between the parties" that "will be actually determined by the judicial declaration sought." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). Only the party whose primary legal right has been breached has standing. *See Cnty. of El Paso v. Navar*, 584 S.W.3d 73, 77 (Tex.

---

[10] Appellees contend that appellants' argument about constitutional standing was never made in the trial court and cannot be raised for the first time on appeal. Because standing is a component of subject matter jurisdiction, it cannot be waived and may be raised for the first time on appeal. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993).

App.—El Paso 2018, no pet.). "Without breach of a legal right belonging to the plaintiff no cause of action can accrue to his benefit." *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976).

A determination of standing focuses on whether a party has a "justiciable interest" in the outcome of the lawsuit, such as when it is personally aggrieved or has an enforceable right or interest. *Lovato*, 171 S.W.3d at 849. It is the nature of the wrong, whether directed against the entity only or against the individual stakeholder, and not the existence of injury, that determines who may sue. *See Haut v. Green Café Mgmt., Inc.*, 376 S.W.3d 171, 177 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Faour v. Faour*, 789 S.W.2d 620, 622 (Tex. App.—Texarkana 1990, writ denied). Typically, a claim-by-claim analysis is necessary to ensure that a particular plaintiff has standing to bring each of his particular claims. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 153 (Tex. 2012).

It is well settled that an individual stakeholder in a legal entity does not have a right to recover personally for harms done to the legal entity. *BJVSD Bird Fam. P'ship, L.P. v. Star Elec., L.L.C.*, 413 S.W.3d 780, 785–86 (Tex. App.—Houston [1st Dist.] 2013, no pet.). This is true even when the damages sought by the individual stakeholder are based on the diminished value of an ownership interest or loss of employee benefits. *See Mendenhall v. Fleming Co.*, 504 F.2d 879, 880-81 (5th Cir. 1974).

A limited liability company is considered a separate legal entity from its members. *Barrera v. Cherer*, No. 04-13-00612-CV, 2014 WL 1713522, at *2 (Tex. App.—San Antonio Apr. 30, 2014, no pet.) (mem. op.). A member of a limited liability company lacks standing to assert claims individually where the cause of action belongs to the company. *See Sherman v. Boston*, 486 S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *APM Enters., L.L.C. v. Nat'l Loan Acquisitions Co.*, No. 06-14-00027-CV, 2014 WL 5317753, at *7 (Tex. App.— Texarkana, Oct.17, 2014, no pet.) (mem. op.) (holding limited liability member has no standing to bring company's causes of action); *Barrera,* 2014 WL 1713522, at *2 (holding limited liability member lacked standing to bring forcible detainer action against tenant on property owned by limited liability company).

## 2. Breach of Fiduciary and Statutory Duties Claim

Appellants' fifth amended petition asserted a claim for breach of fiduciary and statutory duties against C&W, Nwokedi, and Tsang. Appellants alleged:

- Cushman and Nwokedi entered into a listing agreement with appellants authorizing Nwokedi to negotiate on appellants' behalf to consummate the sale of their business;

- Pursuant to the Listing Agreement, Cushman and Nwokedi owed appellants a duty to "negotiate the business terms of any purchase and sale agreement on behalf of appellants and in appellants' best interest";

30

- The Listing Agreement provided C&W's means of control over Nwokedi's acts as the appellants' agent. Once retained by appellants as the seller's agent, Nwokedi also owed appellants a duty of care and duty of loyalty as a fiduciary;

- Instead of advancing appellants' best interests in finding the best sales price, Nwokedi utilized his relationship with appellants for his own financial interest by personally partnering with his friend, Chiosa, and fellow Cushman broker, Tsang, to purchase the Arms Room for a significantly reduced price. In that, Cushman, Nwokedi, and Tsang failed to market or attempt to sell the property and business in question to any other party and instead Nwokedi, Tsang, and Chiosa used their fiduciary relationship with appellants to extract a significantly reduced price for their own financial benefit. At all times material to this transaction, Nwokedi and Tsang acted in the course and scope of their employment with Cushman;

- By becoming a principal and appellants' counterparties in the transaction, while at the same time serving as the James' agents, Nwokedi and Tsang created a conflict of interest that violated the Listing Agreement and his fiduciary duties under Texas law;

- Tsang, another Cushman agent, similarly violated the Listing Agreement and Cushman's fiduciary duties to appellants by partnering with Nwokedi and Chiosa to purchase the Arms Room.

In its motion for summary judgment, C&W argued that the Listing Agreement was between C&W and Bay Area as reflected in the first sentence of the Listing Agreement: "Bay Area Shooter's Center LLC ("Owner") appoints Cushman & Wakefield of Texas, Inc. ("C&W") as its sole agent and grants to C&W the exclusive right to sell the real property." It argued, as it does now on appeal, that it had no contract with the Jameses, and the Jameses, as individuals, lacked standing to sue C&W on behalf of Bay Area.

31

In response, appellants argue that their live pleading demonstrates that appellees had obligations to the Jameses and Bay Area. Although the Listing Agreement was between Bay Area and C&W, the Jameses pleaded specifically that Nwokedi and Tsang were the Jameses' agents and they owed the Jameses fiduciary duties under Texas law. In support of their contention that they have standing, appellants cite *Pike v. Texas EMC Management, LLC*, 610 S.W.3d 763 (Tex. 2020) and *Lipshy v. Burk*, No. 05-19-00493-CV, 2020 WL 6696368 (Tex. App.—Dallas Nov. 12, 2020, no pet.) (mem. op.).

In *Pike,* the appellants challenged a limited partner's recovery of a $7 million damage award for the other partners' breach of the partnership agreement. *See Pike*, 610 S.W.3d at 773. Appellants argued, among other things, that the limited partner lacked standing to recover damages individually for an injury suffered by the partnership. *See id.* The Texas Supreme Court held that "a partner or other stakeholder in a business organization has constitutional standing to sue for an alleged loss in the value of its interest in the organization." *Id.* at 778.

*Lipshy* concerned a dispute between the parties involving several closely held real estate partnerships following the sale of two apartment complexes. *See Lipshy*, 2020 WL 6696368 at *1. Suspecting misconduct in the general partners' management of the partnerships, the limited partners sued the general partners asserting claims for breach of fiduciary duty, common law fraud, and declaratory

and other relief with respect to the sale of the two apartment complexes. *See id.* The general partners argued that the limited partners lacked standing to pursue the claims they asserted. *See id.* at \*2. Specifically, they contended that the allegations set forth in the limited partners' petition all involved alleged wrongs committed against and injuring the partnerships, rather than injuries suffered by the limited partners themselves. *See id.* The Dallas Court of Appeals noted that the "[l]imited [p]artners' first amended petition asserted claims individually for damages based on the reduction in value to their limited partnership interest. In other words, the legal injury giving [the [l]imited [p]artners standing is their diminution in value of equity interest." *Id.* at \*10. Following *Pike*, the court concluded that the limited partners did not lack standing to assert their claims. *See id.*

Appellees argue that *Pike* and *Lipshy* are inapposite because the Jameses are not bringing individual claims for lost value in the company, rather, they are attempting to assert Bay Area's claims. We agree. Appellants' allegations spring from and concern purported violations of the Listing Agreement—an agreement between C&W and Bay Area, a limited liability company, not the Jameses. In their fifth amended petition, appellants alleged that appellees' "breach of fiduciary duty proximately caused loss to [appellants] at least in the form of the significantly reduced selling price of the Arms Room" and "further proximately caused Travis James economic loss in that he was induced to discount his property by $800,000."

33

The Jameses did not own The Arms Room; Bay Area owned it. *See Wyrick v. Business Bank of Texas, N.A.*, 577 S.W.3d 336, 352–53 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (concluding individual guarantors of $3 million loan lacked standing to assert counterclaims against lender for tortious interference with prospective contracts, in lender's action to enforce guaranties after borrower defaulted on loan; guarantors, as sole managing members of borrower, a limited liability company, sought redress for injury to value of disposal but borrower, not guarantors, owned disposal well, and alleged damage to disposal well's value was borrower's injury); *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 361 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (concluding members of LLCs lacked standing to assert construction-related damages sustained by partnership or LLCs where evidence showed that limited partnership owned restaurants, contracted with construction company to finish build-out of restaurant and construct other restaurant, and took out bank loans for construction and furniture, fixtures, and equipment real estate properties, and claims for construction-related damages belonged to limited partnership).

The Jameses lacked standing to assert a breach of fiduciary duty claim against appellees. The trial court did not err in granting summary judgment on their claim.

34

### 3. Fraud Claims

Appellants asserted claims for common law fraud, fraudulent inducement, and statutory fraud[11] against C&W, Nwokedi, Tsang, and Chiosa. Their fifth amended petition alleged:

- Defendants made or caused to be made material misrepresentations, omissions, or misleading statements to appellants concerning the sale of the Arms Room. While purportedly acting on behalf of appellants, Nwokedi knowingly misrepresented his business relationship with Chiosa and Tsang. Plaintiffs relied on these representations to their detriment by ultimately reducing the sales price from Nwokedi's original estimate by almost $7,000,000.

- Further, Nwokedi represented to appellants that the newly created operating company, CEL, would own the real property following the sale. This misrepresentation induced appellants to give up $800,000 of the sale price in exchange for an ownership stake in CEL worth only $75,000.

- Such representations, omissions, and/or misleading statements were made knowing that Plaintiffs relied upon Defendants' integrity and with the intention of inducing Plaintiffs to sell the Arms Room at a reduced price. Plaintiffs relied upon Defendants' representations of value and risk in the sale of the Arms Room because Defendants held themselves out to be credible experts worthy of belief. Plaintiffs suffered damages as a result of their reliance on these misrepresentations.

- Appellees' fraud caused loss to Plaintiffs at least in the form of the significantly reduced selling price of the Arms Room. Defendants' fraud also caused Travis James economic loss in that he was induced to discount his property by $800,000 in exchange for shares in an entity that did not even own the land.

---

[11] *See* TEX. BUS. & COM. CODE ANN. § 27.01(a)(2) ("Fraud in Real Estate and Stock Transactions").

35

To prevail on a claim of fraud, a plaintiff must establish that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) plaintiff suffered an injury by actively and justifiably relying on that representation. *Exxon Corp. v. Emerald Oil & Gas Co., EC.*, 348 S.W.3d 194, 217 (Tex. 2011).

Appellants contend that appellees made a material misrepresentations in two ways: (1) Nwokedi knowingly misrepresented his business relationship with Chiosa and Tsang, and (2) Nwokedi misrepresented to appellants that the newly created operating company, CEL, would own the real property following the sale. Appellants assert that they relied on these representations to their detriment by ultimately reducing the sales price from Nwokedi's original estimate by almost $7,000,000, and foregoing $800,000 of the sale price in exchange for an ownership stake in CEL worth only $75,000.

With regard to the first alleged misrepresentation, C&W argues, as it did in its summary judgment pleadings, that Travis's declaration, attached to appellants' summary judgment response, demonstrates that appellants knew that Nwokedi and Tsang were working on both sides of the transaction before it closed and proceeded

36

to work with them, anyway. C&W asserts that the only remaining facts alleging malfeasance concern whether Travis was misled about his ownership interest in CEL Arms Room Holdings, LLC, which has nothing to do with C&W or any brokerage services.

In his declaration, Travis attested, in pertinent part:

> "[A]t some point in April or May 2018, Mr. Nwokedi informed us that he and Tin Ho Tsang, another Cushman broker, would be joining Mr. Chiosa in purchasing the Arms Room. At the time, Mr. Nwokedi and Mr. Tsang's involvement did not raise many alarms considering the deal was supposed to close soon. The concern about financing even seemed to be alleviated because, from my perspective, Mr. Nwokedi and Mr. Tsang's involvement would hopefully cure those issues and the deal would close.

Travis's declaration shows that appellants were aware of Nwokedi and Tsang's business relationship with Chiosa prior to the closing of the transaction in July 2018. The summary judgment evidence refutes appellants' assertion that Nwokedi misrepresented his business relationship with Chiosa and Tsang to appellants.

As to the second alleged misrepresentation—that Nwokedi misrepresented to appellants that the newly created operating company, CEL, would own the real property following the sale—C&W argues that to the extent Travis was misled about his ownership interest in CEL Arms Room Holdings, LLC, it has nothing to do with C&W or any brokerage services.

In his declaration, Travis stated:

37

After Mr. Nwokedi and Mr. Tsang informed me they would become purchasers, in or around May or June 2018, Mr. Nwokedi approached me regarding transitioning the $800,000 loan into equity for myself into the new company that owned the real estate. Mr. Nwokedi also represented to me that Mr. Chiosa would not move forward with the sale unless the $800,000 loan was transitioned to equity. In a phone call, Mr. Chiosa and Mr. Nwokedi convinced me to proceed with the transition to equity because of the personal ownership interest in the limited liability company that owned the real estate and that we all would become partners in the success of the business. These representations made sense to me because $800,000 represented roughly 15% of the purchase price based on the value of the real estate. Again, I believed Mr. Chiosa and Mr. Nwokedi's representations about the ownership interest and partnership and agreed to transition the $800,000 loan for an interest in the limited liability company that owned the real estate.

These statements are some evidence that Nwokedi and Chiosa misrepresented to the Jameses that in converting the loan to equity, Travis would take an ownership interest in the business entity that owned the real property underlying the transaction.[12] These alleged material misrepresentations were directed toward Travis and raise a genuine issue of material fact on the first element of the Jameses' fraud claim against Nwokedi and Chiosa. Appellants do not allege, however, that C&W and Tsang were involved in the second misrepresentation. Thus, appellants' fraud claim against C&W and Tsang does not survive summary judgment.

---

[12] Nwokedi, Tsang, and Chiosa joined and adopted C&W's summary judgment motion. In his own summary judgment motion—which was joined by C&W, Tsang, and Chiosa—Nwokedi addressed only Bay Area's capacity to sue and did not move for summary judgment on the Jameses' claims against him. Chiosa's motion for summary judgment and reply brief mirrored C&W's summary judgment pleadings.

38

Appellants' fraudulent inducement and statutory fraud claims do not survive summary judgment. Fraudulent inducement is a "species of common-law fraud" that "arises only in the context of a contract." *Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019). This cause of action shares the same basic elements as a common-law fraud claim, but it requires the existence of a contract as an essential element of proof. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *see Haase v. Glazner*, 62 S.W.3d 795, 798, 800 (Tex. 2001) (stating fraudulent inducement, by its nature, presupposes that party has been induced to enter contract; as a result, there can be no fraudulent inducement claim when there is no contract). Similarly, a statutory fraud claim under Texas Business and Commerce Code section 27.01(a)(2) ("Fraud in Real Estate and Stock Transactions") lies only where a valid, enforceable contract exists. *See* TEX. BUS. & COM. CODE ANN. § 27.01(a)(2).

The Listing Agreement was between Bay Area and C&W. Thus, only Bay Area could assert claims for fraudulent inducement and statutory fraud. As we have concluded, however, Bay Area lacked capacity to sue C&W because it forfeited its corporate charter. Because the Jameses did not have a contract with C&W, Nwokedi, Tsang, or Chiosa, they could not assert fraudulent inducement and statutory fraud claims.

For the reasons discussed above, we conclude that the trial court properly granted summary judgment in favor of C&W and Tsang on the Jameses' fraud claim, but that it erred in granting summary judgment on that claim in favor of Nwokedi and Chiosa. We further hold that the trial court properly granted summary judgment in favor of appellees on the Jameses' fraudulent inducement and statutory fraud claims.

### 4. Breach of Contract Claim

The Jameses asserted a claim for breach of contract against C&W, Nwokedi, and Tsang. They alleged:

- The Listing Agreement is a valid and enforceable contract. Appellants performed all obligations under the Listing Agreement by tendering payment of a commission to appellees in accordance with its terms;

- Appellees, who received commission from sale of the Arms Room, acting as appellants' agent, breached their fiduciary duties and Texas Real Estate Commission requirements to their clients, appellants, and therefore breached contractual duties pursuant to the Listing Agreement. Appellants have been severely monetarily damaged by appellees' breach.

To prevail on a breach of contract claim, a plaintiff must establish that (1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

40

In its summary judgment motion, C&W sought dismissal of appellants' breach of contract claim on the ground that the Listing Agreement was between Bay Area and C&W and C&W had no contract with the Jameses. They also argued that Bay Area did not have capacity to bring suit as a forfeited entity, and that the Jameses had no standing to pursue claims against appellees on behalf of Bay Area under the Listing Agreement. We agree.

Here, the first sentence of the Listing Agreement states: "Bay Area Shooter's Center LLC ("Owner") appoints Cushman & Wakefield of Texas, Inc. ("C&W") as its sole agent and grants to C&W the exclusive right to sell the real property." As a general rule, a suit for breach of contract may not be maintained against a person who is not a party to the contract. *See Plan B Holdings, LLC v. RSLLP*, 681 S.W.3d 443, 455–56 (Tex. App.—Austin 2023, no pet.); *Mission Grove, L.P. v. Hall*, 503 S.W.3d 546, 551–52 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Bay Area, as a limited liability company, is legally distinct from its members. *See Rieder v. Woods*, 603 S.W.3d 86, 98 (Tex. 2020). As discussed above, Bay Area did not have capacity to sue appellees. Because the undisputed summary judgment evidence established that the Jameses were not parties to the contract between C&W and Bay Area, the trial court properly granted summary judgment in favor of appellees on the Jameses' breach of contract claim.

## 5.  Negligent Misrepresentation Claim

The Jameses asserted a claim for negligent misrepresentation against C&W, Nwokedi, Tsang, and Chiosa.  The fifth amended petition alleged:

- Appellees made representations to appellants in the course of the transaction that forms the basis of this suit.  The representations made by appellees were misstatements of fact.  Appellants justifiably relied on appellees' representations because appellees held themselves out to be credible experts worthy of belief.  Appellees' negligent misrepresentation caused loss to appellants at least in the form of the significantly reduced selling price of The Arms Room.  Appellees' negligent misrepresentation also caused Travis James economic loss in that he was induced to discount his price by $800,000 in exchange for shares of an entity that did not even own the land.

The elements of negligent misrepresentation are: (1) the representation is made by a defendant in the course of the defendant's business or in a transaction in which the defendant has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.  *See Tukua Invests., LLC v. Spenst*, 413 S.W.3d 786, 802 (Tex. App.—El Paso 2013, pet. denied) (citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)); *Thompson v. Deloitte & Touche, L.L.P.*, 902 S.W.2d 13, 19 (Tex. App.—Houston [1st Dist.] 1995, no pet.).

Appellants complain that "[a]ppellees made representations to appellants in the course of the transaction that forms the basis of this suit," and "appellants

justifiably relied on appellees' representations because appellees held themselves out to be credible experts worthy of belief." Appellants' claim arises from alleged representations made in connection with the Listing Agreement between Bay Area and C&W. Because as we have concluded, claims concerning the Listing Agreement or representations made in connection with the same belong to Bay Area, and the Jameses cannot advance those claims individually, the trial court properly granted summary judgment on those claims. Further, because appellants allege misrepresentations arising from the agreement to which Nwokedi, Tsang, and Chiosa were not parties, their negligent misrepresentation claim against Nwokedi, Tsang, and Chiosa on this basis also fails.

The Jameses also alleged that Nwokedi and Chiosa misrepresented the nature of the CEL equity agreement and Travis's investment in it. Those representations are independent of the Listing Agreement and concern a separate arrangement between Travis, Nwokedi, and Chiosa. Appellants' negligent misrepresentation claim thus survives summary judgment as to Nwokedi and Chiosa. Because appellants do not allege that C&W or Tsang made those representations, appellants' negligent misrepresentation claim based on the CEL agreement does not survive summary judgment as to C&W and Tsang.

The trial court properly granted summary judgment on the Jameses' negligent misrepresentation claim against C&W and Tsang, but it erred in granting summary judgment as to appellants' claim against Nwokedi and Chiosa.

## 6. Negligent Hiring and Negligent Supervision Claim

Appellants brought a claim for negligent hiring and supervision against C&W.[13] They alleged:

- C&W owed appellants a legal duty to exercise ordinary care in the hiring of competent employees, retaining competent employees, and in the supervision and training and management of its employees.

- C&W failed to use ordinary care in these respects, including, but not limited to:

  a. Hiring incompetent or unfit real estate brokers, Nwokedi and Tsang;

  b. Failing to properly supervise its personnel, Nwokedi and Tsang;

  c. Failing to implement adequate safeguards to prevent the situation that resulted in appellants' damages;

  d. Failing to provide adequate oversight and training for its employees; and

---

[13]    "Negligent hiring, training, supervision, and retention claims are 'simple negligence causes of action based on an employer's direct negligence rather than on vicarious liability.'" *Doe v. YUM! Brands, Inc.*, 639 S.W.3d 214, 225 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *Black v. Smith Protective Servs., Inc.*, No. 01-14-00969-CV, 2016 WL 5400565, at *3 (Tex. App.—Houston [1st Dist.] Sept. 23, 2016, no pet.) (mem. op.).  To assert direct liability based on a negligence claim, the plaintiff must prove the existence of a legal duty, breach of that duty, and damages proximately resulting from the breach.  *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990); *YUM! Brands, Inc.*, 639 S.W.3d at 225.

e. Failing to caution and advise Nwokedi in his representation of appellants.

- These conditions created an environment in which misrepresentations, and/or concealment of material facts to and from others, were likely and reasonably foreseeable to occur, and which in fact did occur in the course of the transaction described above, which proximately caused the damages sustained by appellants.

In its motion for summary judgment, C&W argued that Bay Area's tort claims—including negligent hiring and supervision—were barred by the applicable statute of limitations. They asserted:

> The Fifth Amended Petition says, "During the period from August 1, 2017 to July 16, 2018, C&W and Nwokedi represented Plaintiffs in the sale of real property." . . . Plaintiffs' Original Petition was filed on July 15, 2020, so the Plaintiffs obviously believed that the Statute of Limitations on their tort claims would run on July 16, 2018.

C&W argued that because Bay Area joined the suit on October 12, 2020—after the applicable two-year limitations period had expired—its tort claims, including its negligent hiring and supervision claim, were barred. C&W did not, however, move for summary judgment on the Jameses' claim of negligent hiring and supervision. Having failed to do, the trial court erred in granting summary judgment on the Jameses' negligent hiring and supervision claim against C&W. *See G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) ("Granting a summary judgment on

a claim not addressed in the summary judgment motion therefore is, as a general rule, reversible error.").[14]

### 7. Civil Conspiracy Claim

Appellants asserted a claim for civil conspiracy against C&W, Nwokedi, Tsang, and Chiosa. They alleged:

- Defendants are liable for civil conspiracy. Upon information and belief, Chiosa, Nwokedi, and Tsang jointly conspired against appellants to attain an unlawful objective, namely to breach the fiduciary duties owed to appellants, reduce the price of The Arms Room, and convert Travis James' $800,000 investment into stock valued at $75,000 for the operating entity that did not own the real estate. Appellees had a meeting of the minds for the attainment of unlawful objectives against appellants. Appellees further took actual, overt, and unlawful steps to accomplish their unlawful objectives against appellants and did, in fact, attain their unlawful objectives against appellants. As a result of appellees' conspiratorial and unlawful actions, appellants incurred actual and consequential damages.

- Appellees' conspiratorial and unlawful actions against appellants were done maliciously and in bad faith and, therefore, appellants would request the Court allow exemplary damages against appellees on this count.

The elements of civil conspiracy are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019). "Conspiracy

---

[14] The limited exception to the rule—when the underlying motion omitted one of multiple causes of action but the omitted ground was intertwined with, and precluded by, a ground addressed in the motion—does not apply here. *See G & H Towing*, 347 S.W.3d at 297.

is a derivative tort because 'a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.'" *Nguyen v. Watts*, 605 S.W.3d 761, 793 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *see Agar Corp.*, 580 S.W.3d at 142–43 (recognizing conspiracy as theory of derivative liability, not an independent tort). Because there "can be no independent liability for civil conspiracy," a plaintiff does not have a viable conspiracy claim if the trial court correctly grants summary judgment on the underlying tort. *Nguyen*, 605 S.W.3d at 793. An actionable civil conspiracy exists only as to those parties who are aware of the intended harm or proposed wrongful conduct at the outset of the combination or agreement. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). As a derivative tort, civil conspiracy does not have its own statute of limitations; rather, its limitations period is tied to the underlying tort. *See Agar Corp., LLC*, 580 S.W.3d at 142.

Because we have concluded that the trial court properly granted summary judgment as to all of appellants' claims against Tsang[15] and, thus, there is no underlying tort upon which to base their civil conspiracy claim against him, the trial

---

[15] *See supra* discussion in section 8.

47

court properly granted summary judgment on appellants' civil conspiracy claim against Tsang.

With respect to the remaining appellees, C&W, Nowkedi, and Chiosa moved for summary judgment on Bay Area's claim for civil conspiracy arguing that it was barred by the two-year statute of limitations.[16] They did not, however, move for summary judgment on the Jameses' claim for civil conspiracy. Having failed to do so, the trial court erred in granting summary judgment on the Jameses' civil conspiracy claim against C&W, Nwokedi, and Chiosa. *See G & H Towing*, 347 S.W.3d at 297.[17]

## 8. DTPA Claim

Appellants asserted a claim for violations of the DTPA against C&W, Nwokedi, and Tsang.[18] The fifth amended petition alleged:

- Appellants engaged C&W and Nwokedi to render services as appellants' sales agent under the Listing Agreement. Payment for

---

[16] We need not address limitations as it concerns Bay Area's civil conspiracy claim because we have already concluded Bay Area lacked capacity to sue.

[17] The limited exception to the rule—when the underlying motion omitted one of multiple causes of action but the omitted ground was intertwined with, and precluded by, a ground addressed in the motion—does not apply here. *See G & H Towing*, 347 S.W.3d at 297.

[18] The elements of a DTPA claim are (1) the plaintiff is a consumer; (2) the defendant engaged in a false, misleading, or deceptive act; (3) the consumer relied on that act to the consumer's detriment; and (4) the act constituted a producing cause of the plaintiff's damages. *See* TEX. BUS. & COM. CODE ANN. §§ 17.46, -.50; *Shkolnick*

48

C&W, Nwokedi, and Tsang's services was to occur on a commission basis, which makes appellants a consumer of appellees' services. Throughout the sales process, Defendants deceived and misled Plaintiffs by secretly partnering with the buyer, Chiosa. These misleading acts resulted in Plaintiffs' loss of significant profit from the wrongfully suppressed sales price of the Arms Room.

In their summary judgment motion, C&W moved to dismiss all of Bay Area's claims arguing that because it had forfeited its charter, Bay Area lacked capacity to sue. We have already concluded that Bay Area lacked capacity to sue and that the Jameses cannot individually assert claims on behalf of Bay Area. The Jameses therefore cannot advance any claims under the DTPA as a consumer under the Listing Agreement. The trial court's dismissal of Bay Area's DTPA claim was thus proper.

In summary, we conclude:

- the trial court properly granted summary judgment on Bay Area's claims against appellees because, as a forfeited company, it did not have capacity to sue appellees, and the version of Texas Business Organizations Code section 11.356(a) then in effect does not apply;

*v. Coastal Fumigators, Inc.*, 186 S.W.3d 100, 104 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

49

- the trial court properly granted summary judgment on the Jameses' claim for breach of fiduciary and statutory duties against appellees because they lacked standing to bring those claims;

- the trial court properly granted summary judgment to C&W and Tsang on the Jameses' claim for common law fraud, but it erred in granting summary judgment in favor of Nwokedi and Chiosa on that claim because a fact issue exists as to whether Nwokedi and Chiosa made material misrepresentations to Travis;

- the trial court properly granted summary judgment to appellees on the Jameses' fraudulent inducement and statutory fraud claims because the Jameses did not have a contract with C&W, Nwokedi, Tsang, or Chiosa;

- the trial court properly granted summary judgment to appellees on the Jameses' claim for breach of contract because the Jameses were not parties to the Listing Agreement;

- the trial court properly granted summary judgment on the Jameses' negligent misrepresentation claim against C&W and Tsang because (a) their claim arises from the representation made in connection with the Listing Agreement between Bay Area and C&W and therefore such a claim belongs to Bay Area, not the Jameses, and Bay Area lacked capacity to sue, and (b) their claim based on the CEL agreement does not involve C&W or Tsang, but the trial court erred in granting summary judgment to Nwokedi and Chiosa on the Jameses' negligent

50

misrepresentation claim because the Jameses alleged they misrepresented the nature of the CEL equity agreement and Travis's investment in it which are representations independent of the Listing Agreement;

- the trial court erred in granting summary judgment to C&W on the Jameses' negligent hiring and supervision claim because C&W did not move for summary judgment on this claim;

- the trial court properly granted summary judgment on the Jameses' civil conspiracy claim against Tsang because there is no surviving underlying tort upon which to base their conspiracy claim against him, but it erred in granting summary judgment to C&W, Nwokedi, and Chiosa on the Jameses' civil conspiracy claim because they did not move for summary judgment on this claim; and

- the trial court properly granted summary judgment to C&W, Nwokedi, and Tsang on the Jameses' DTPA claim.

## II.  C&W's Cross-Appeal

C&W brings this cross-appeal contending that the trial court erred when it rendered a take-nothing judgment on C&W's counterclaim under the DTPA for attorney's fees against cross-appellees, Lisa and Travis, on the basis that their DTPA claim was groundless and brought in bad faith.

51

## A. Pretrial Proceedings

In its third amended answer and request for disclosure, C&W asserted a counterclaim against cross-appellees for asserting a bad faith DTPA claim. It argued that "under the DTPA, plaintiff cannot bring a suit against real estate brokers and salespeople" and further that cross-appellees were precluded from asserting their DTPA claim under section 17.49(g) because the total amount in controversy exceeded $500,000 and did not involve the consumer's residence.[19] Thus, it argued, cross-appellees' DTPA claim was groundless in law or brought in bad faith, and C&W was entitled to recover reasonable and necessary attorney's fees and court costs in defense of its action.

Cross-appellees moved for traditional and no-evidence summary judgment on C&W's counterclaim arguing that neither section of the DTPA cited by C&W barred their DTPA claim. They asserted that their claim against C&W's real estate salespeople was proper because while the DTPA precludes certain claims against real estate brokers, it nonetheless allows suits against real estate brokers if they knowingly omit material facts in describing their services or engage in an unconscionable course of action.[20] *See id.* Here, they argued, C&W's real estate brokers signed a Listing Agreement stating they were acting in cross-appellees' best

---

[19]    *See* TEX. BUS. & COM. CODE ANN. § 17.49(i), (g).

[20]    *See id.* §§ 17.46(b)(24), 17.49(i)(1), (3).

52

interest while they were negotiating behind the scenes against cross-appellees to buy the property and business they were selling as cheaply as possible. Thus, C&W's real estate brokers knowingly omitted information to cross-appellees about their services, specifically that they were negotiating against cross-appellees' interests. Cross-appellees also asserted that the brokers engaged in unconscionable conduct by (1) failing to notify them of the extent of their conflict of interest and the length of time they had intended to purchase The Arms Room, and (2) defrauding Travis of $800,000 of the sales price of The Arms Room in exchange for $75,000 worth of ownership in the operating entity, CEL, instead of the stake in the real estate to which the parties had agreed. Cross-appellees further argued that, contrary to C&W's assertion, their claim was not precluded by section 17.49(g) because the commission they paid for C&W's brokers' services was less than $500,000, and thus their claim was within the DTPA's limits.

Cross-appellees' summary judgment evidence included a May 25, 2018 email between Travis and Nwokedi with several attachments, among them, a Disclosure Letter dated April 10, 2018, from Nwokedi to Mary James, stating, in part:

> By this letter, I would like to confirm our prior conversations in which I advised you that I would like to become a minority owner in the entity that purchases the Property and that there are various conflicts of interests, or potential conflicts of interest, arising out of my representation of you under the Agreement and my becoming a minority owner in the entity that purchases the Property. However, despite such conflicts of interests, or potential conflicts of interest, you have agreed to waive any such conflicts of interest, or potential

conflicts of interest, and have consented and approved that I may become a minority owner in the entity that purchases the Property.

Mary signed the letter on May 25, 2018.

C&W filed its summary judgment response and its cross-motion for summary judgment on its DTPA counterclaim. In its summary judgment response, C&W asserted that the brokers could not be held liable under the DTPA because the brokers did, in fact, disclose the supposed conflict and C&W did not engage in an unconscionable act by cutting Travis out of a 15% ownership arrangement in a newly formed company. They also asserted that cross-appellees had filed groundless claims in bad faith. In its cross-motion for summary judgment, C&W argued that cross-appellees' claims had no basis in fact because they knew that the brokers were on both sides of the transaction. It argued cross-appellees' claims for breach of contract and fraud had no basis in law because they had waived or ratified the brokers' dual representation when they signed the disclosure letter assenting to any potential conflict. C&W argued that cross-appellees' litigation misconduct in alleging that Mary's signature on the disclosure letter was forged—despite having irrefutable proof of the falsity of the forgery claim—justified a finding that cross-appellees' claims were brought in bad faith.

Cross-appellees responded to C&W's cross-motion for summary judgment by fully incorporating their traditional and no-evidence motion for summary judgment. C&W filed an objection and supplemental response to cross-appellees' summary

54

judgment motion. It objected to insufficient notice of cross-appellees' summary judgment motion because cross-appellees failed to provide the required thirty-day notice of the hearing on their motion. C&W further argued that cross-appellees' theory that their DTPA claim was viable because the brokers made less than $500,000 in commission was misplaced because the "total consideration" conferred by cross-appellees, as contemplated by the DTPA, exceeded $500,000.

C&W filed a reply in support of its cross-motion for summary judgment contending that cross-appellees' response to the cross-motion, which merely incorporated their traditional and no-evidence summary judgment motion, was no response but rather a tacit admission that they allowed misrepresentations about the allegedly forged disclosure letter and whether they were aware of the brokers' dual roles to persist without correcting the record.

Following a hearing, the trial court entered orders denying (1) cross-appellees' traditional and no-evidence motion for summary judgment on C&W's counterclaim and (2) C&W's cross-motion for summary judgment.

## B. Bench Trial

Following its rulings on the parties' summary judgment motions, the trial court held a bench trial on C&W's counterclaim to recover attorney's fees under the DTPA. The trial court admitted numerous exhibits into evidence, including:

- Travis's Declaration dated October 19, 2021 ("first declaration")

- The Listing Agreement

- The November 30, 2017 email from Nwokedi to Chiosa stating, "Looks like the [sic] Harvey set them back a bit. Maybe this gives us room to negotiate?"

- Email from Nwokedi to Travis dated May 24, 2018, asking James to have the Disclosure Letter signed

- Email from James to Nwokedi dated May 25, 2018 stating, "here is everything signed"

- Email from Travis to Nwokedi dated May 29, 2018 confirming Nwokedi's receipt of the signed documents

- The Disclosure Letter signed by Mary on May 25, 2018

- Travis's Declaration dated April 27, 2022 ("second declaration")

- Settlement Statement

- A Report on Forensic Document Examination

- Parties' discovery requests and responses

- Correspondence among counsel related to appellants' allegation of forgery

C&W's counsel testified to the reasonableness and necessity of C&W's attorney's fees. He testified that C&W incurred attorney's fees in the litigation totaling $283,719.21. C&W sought to recover $122,105.94 representing the portion of the total fees incurred after cross-appellees' filed their DTPA claim.[21]

---

[21] C&W's counsel testified that C&W also sought conditional appellate attorney's fees in the amount of $46,500 for an appeal to this Court and $20,000 should the case proceed to the Texas Supreme Court.

On May 30, 2023, the court entered a final judgment that C&W take nothing on its DTPA counterclaim.

## C. Applicable Law and Standard of Review

The DTPA authorizes a trial court to award a defendant its reasonable and necessary attorney's fees and court costs if the court finds that "an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment." TEX. BUS. & COM. CODE ANN. § 17.50(c). A claim under the DTPA is not groundless, brought in bad faith, or for the purpose of harassment if the totality of the evidence demonstrates an arguable basis for the consumer's claim. *Splettstosser v. Myer*, 779 S.W.2d 806, 808 (Tex. 1989).

The term "groundless" as used in the DTPA has the same meaning as it does under Texas Rule of Civil Procedure Rule 13, that is, "no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." TEX. R. CIV. P. 13. To determine whether a DTPA claim is groundless, a trial court must examine the facts available to the litigant and circumstances existing when the litigant filed his or her pleadings. *WWW.URBAN.INC v. Drummond*, 508 S.W.3d 657, 674 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Davila v. World Car Five Star*, 75 S.W.3d 537, 542–43 (Tex. App.—San Antonio 2002, no pet.) (applying case law interpreting Rule 13 to motion for attorney's fees under DTPA). The standard for determining whether a suit is

groundless is "whether the totality of the tendered evidence demonstrates an arguable basis in fact and law for the consumer's claim." *Splettstosser v. Myer*, 779 S.W.2d 806, 808 (Tex.1989). Groundlessness is more than an ultimate determination that the claim is not a winner. *See Emmons v. Purser*, 973 S.W.2d 696, 700 (Tex. App.—Austin 1998, no pet.).

Questions of whether an action is groundless, brought in bad faith, or brought for the purpose of harassment are reserved solely for the trial court. *See Donwerth v. Preston II Chrysler-Dodge, Inc*., 775 S.W.2d 634, 637 (Tex. 1989). Appellate review of such determinations is a question of law under an abuse of discretion standard. *Id.* at 637 n.3. We may reverse a trial court's determination that a DTPA claim has been brought in good faith only if the court acts without reference to guiding rules and principles or acts arbitrarily or unreasonably. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). A trial court does not abuse its discretion when it bases its opinion on conflicting evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978). An appellate court may not substitute its judgment for that of the trial court in assessing whether the trial court abused its discretion. *Id.*

If the evidence establishes any arguable basis in fact or law for the DTPA claim, a claim for attorney's fees under 17.50(g) is not proper. *Barkausen v. Craycom, Inc.*, 178 S.W.3d 413, 422 (Tex. App.—Houston [1st Dist.] 2005, pet.

58

denied). Even if a court disagrees with the plaintiff's legal contentions, evidence showing a good-faith belief in a DTPA violation is sufficient to establish the claim is not groundless or brought in bad faith. *Ostrow v. United Bus. Machs., Inc.*, 982 S.W.2d 101, 106 (Tex. App.—Houston [1st Dist.] 1998, no writ).

## D. Disclosure Letter

C&W contends that the trial court erred when it rendered a take-nothing judgment on its DTPA counterclaim. It argues that cross-appellees' repeated allegation across six pleadings that Travis did not know that the brokers were on both sides of the real estate transaction, only to later admit in a sworn statement that the brokers' dual roles were disclosed to him months before the transaction closed, demonstrates that cross-appellees' DTPA claim is groundless and brought in bad faith.

In support of its argument, C&W point to the allegations in cross-appellees' fifth amended petition that Nwokedi "was surreptitiously working as both buyers' and sellers' agent" and "knowingly misrepresented his business relationship with Chiosa and Tsang." C&W argues that "[t]he gravamen of [cross-appellees'] DTPA claim is that '[t]hroughout the sales process, [C&W and the brokers] deceived and misled [them] by secretly partnering with the buyer, Chiosa. These misleading acts resulted in [cross-appellees'] loss of significant profit from the wrongfully suppressed sales price of [T]he Arms Room.'" They further complained that they

were "deceived and misled," and that the deception occurred throughout the sales process. C&W argues that Travis's admission in his sworn declaration in response to C&W's motion for summary judgment that he was informed of the brokers' dual roles in April or May 2018, which was two to three months before the transaction closed, contradicts cross-appellees' DTPA claim that they were misled throughout the sales process and their being misled caused them to lose significant profit.

Cross-appellees respond that C&W mischaracterizes their DTPA claim. They assert that the conflict-of-interest waiver in the Disclosure Letter, even if authentic, did not defeat their DTPA claim. They argue that the deceptive and partial disclosure of Nwokedi's conflict of interest shortly before closing did not cure the deceptive conduct that occurred throughout the sale process.

The record shows Nwokedi approached the Jameses about selling The Arms Room in June or July 2017. Bay Area entered into the Listing Agreement with C&W effective on August 1, 2017. The agreement provided, among other things, that "C&W will negotiate the business terms of any purchase and sale agreement on behalf of Owner and in Owner's best interest." Soon afterwards, Nwokedi informed the Jameses that he had a likely buyer for the business, Chiosa. Mary signed Chiosa's offer of purchase on October 3, 2017.

In his first declaration, Travis stated that "after signing the offer, despite Mr. Nwokedi's representations, there were significant delays while Chiosa attempted to

get financing." Travis stated that he and his family asked Nwokedi if there were other individuals willing to purchase the business. He stated that his family provided Nwokedi and C&W with contact information for other potential buyers but Nwokedi repeatedly stated that this was the best possible and only deal available.

On November 30, 2017, Nwokedi emailed Chiosa stating, "Looks like the [sic] Harvey set them back a bit. Maybe this gives us room to negotiate?"

On April 10, 2018, Nwokedi wrote the disclosure letter to Mary, stating:

> By this letter, I would like to confirm our prior conversations in which I advised you that I would like to become a minority owner in the entity that purchases the Property and that there are various conflicts of interests, or potential conflicts of interest, arising out of my representation of you under the Agreement and my becoming a minority owner in the entity that purchases the Property. However, despite such conflicts of interest, or potential conflicts of interest, you have agreed to waive any such conflicts of interest, or potential conflicts of interest, and have consented and approved that I may become a minority owner in the entity that purchases the Property.

Nwokedi emailed Travis on May 24, 2018, asking James to have the Disclosure Letter signed. In an email to Nwokedi dated May 25, 2018, Travis responded, "here is everything signed." In his second declaration, Travis stated, "In April 2018, Edward Nwokedi informed me he would become a minority owner in the entity purchasing the Arms Room. I was unaware, however, that Edward Nwokedi had been working with the buyers to purchase the Arms Room for numerous preceding months."

The evidence shows that while the brokers disclosed their dual roles representing both the sellers and buyers to cross-appellees in April 2018, they did not disclose their dual representation between August 2017 (the effective date of the Listing Agreement) and April 2018 (the date of the Disclosure Letter). The evidence shows that Nwokedi was in communication with Chiosa, the buyer, during that period, suggesting to him on at least one occasion that they may have room to negotiate with cross-appellees because Hurricane Harvey "set them back a bit." This evidence does not support C&W's assertion that cross-appellees' DTPA claim was groundless or brought in bad faith based on the disclosure letter.

## E. Exemption Under Section 17.49(g)

C&W asserts that cross-appellees' DTPA claim is groundless and brought in bad faith because they knew that their claim exceeded the statutory limit under section 17.49(g) of the DTPA. Cross-appellees respond that their claim is not precluded under 17.49(g) because although the total damages sought exceed $500,000, the total consideration paid to C&W and its brokers under the Listing Agreement totaled $325,000 and thus their claim was not barred by section 17.49(g)'s large transaction exemption.

The Texas Business and Commerce Code exempts from the DTPA "a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000,

other than a cause of action involving a consumer's residence." TEX. BUS. & COM. CODE ANN. § 17.49(g). The DTPA does not define the term "total consideration," but cross-appellees argue courts have stated that "[c]onsideration is a bargained-for exchange of promises or return performance and consists of benefits and detriments to the contracting parties." *Tork v. Garcia*, No. 13-21-00077-CV, 2023 WL 2707405, at *7 (Tex. App.—Corpus Christi–Edinburg Mar. 30, 2023, no pet.) (mem. op.); *Estate of Childs*, No. 04-18-00900-CV, 2020 WL 1931627, at *5 (Tex. App.—San Antonio Apr. 22, 2020, no pet.) (mem. op.); *Iacono v. Lyons*, 16 S.W.3d 92, 94 (Tex. App.—Houston [1st Dist.] 2000, no pet.); *see also* Consideration, BLACK'S LAW DICTIONARY (11th ed. 2019). C&W argues that calculating "total consideration" means tabulating not only the amount of money paid but the lost profits that flow from an allegedly breached deal, and because $7,000,000 is greater than $500,000, section 17.49(g) precludes cross-appellees' DTPA claim. In support of its argument, C&W points to cross-appellees' fifth amended petition in which they alleged that, relying on Nwokedi's misrepresentations, they "reduced the sales price from Nwokedi's original estimate by almost $7,000,000" and they "lost significant profit from the wrongfully suppressed sales price of The Arms Room." Thus, because according to cross-appellees' pleadings, the "suppressed sales price of the Arm's Room is almost $7,000,000," C&W argues the $500,000 cap in section 17.49(g) precludes their DTPA claim.

Cross-appellees respond that their DTPA claim is not barred by the large transaction cap under section 17.49(g) because the cap focuses on the "total consideration by the consumer" for the transaction giving rise to the DTPA claim, not the amount in controversy or damages sought in a case, and the consideration for Nwokedi's services under the Listing Agreement was his commission on the transaction which amounted to $325,000.

We agree with cross-appellees that section 17.49(g) focuses on the "total consideration by consumer" and that their DTPA claim was not precluded under that section. Section 17.49(g) exempts from the DTPA "a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving *total consideration by the consumer* of more than $500,000 . . . ." TEX. BUS. & COM. CODE ANN. § 17.49(g) (emphasis added). Nothing in the statute states that a claim is precluded based on the amount in controversy or lost profits.

C&W's reliance on *E. Hill Marine, Inc. v. Rinker Boat Co. Inc.*—the only case on which it relies—is misplaced. 229 S.W.3d 813, 821 (Tex. App.—Fort Worth 2007, pet. denied). The court in *E. Hill Marine* did not, as C&W contends, hold that lost profits are considered when calculating "total consideration" under section 17.49(g). In that case, E. Hill Marine ("EHM") entered into a verbal agreement with Rinker Boat Co., Inc. for EHM to be the "exclusive Rinker dealer in North Dallas." *See id.* at 815. EHM paid no money to Rinker to become a dealer, but over the

following seven months, it purchased boats from Rinker for eventual sale to third parties. *See id.* Rinker later terminated EHM's dealership status and EHM sued Rinker asserting, among other claims, a claim under the DTPA. *See id.* EHM testified that its claims in the lawsuit involved, in part, "a transaction" in which EHM claimed it "had ordered $575,000 or more in new units" from Rinker. *Id.* at 820. That was the "money [EHM] was going to pay Rinker to purchase boats so that [EHM] could then sell them on to end customers." *Id.* EHM testified that its claims were based, in part, "out of a claim for $859,513 in orders." *Id.* In its petition, EHM sought recovery for lost profits "which would have included the lost profits on the $859,513 that [EHM] promised to pay [Rinker] for the boats." *Id.* To avoid the exemption under section 17.49(g), EHM claimed that notwithstanding the amount it promised to pay Rinker, the sole transaction under which it sought recovery under the DTPA was its application to sell Rinker boats, at which time "there was no promise to pay more than $500,000" and "there was an agreement under which [EHM] could theoretically never purchase a boat." *Id.*

The appellate court rejected EHM's argument concluding its DTPA claim was precluded under section 17.49(g). *See id.* at 821. The court, however, did not as C&W contends, consider the lost profits EHM was seeking to recover in the suit to calculate "total consideration by the consumer" under section 17.49(g). Indeed, there was no evidence offered on the value of such lost profits. The court instead

65

concluded that EHM's DTPA claim was precluded under 17.49(g), because EHM—the consumer—"promised to pay [Rinker] $859,513 and then sued to recover the lost profits on *this* amount." *Id.* (Emphasis added). Thus, the court concluded, EHM's claim exceeded the $500,000 limit under section 17.49(g). *See id.*

In this case, the transaction that formed the basis of cross-appellees' DTPA claim was the Listing Agreement. Cross-appellees argued below, and C&W did not dispute, that the total commission paid by cross-appellees under the Listing Agreement was $325,000. Because section 17.49(g) focuses on the "total consideration by the consumer," we thus conclude that cross-appellees' claim was not precluded under section 17.49(g). *See, e.g.*, *Hannover Life Reassurance Co. of Am. v. Baker, Lowe, Fox Ins. Mktg., Inc.*, No. 3:01CV0597-D, 2001 WL 1586874, at *7 (N.D. Tex. Dec. 10, 2001) (stating that section 17.49(g) did not apply merely because damages caused by defendant's "wrongful conduct can exceed the consideration involved in a transaction.").

## F. Exemption Under Section 17.49(i)

C&W further contends that cross-appellees' DTPA claim is groundless and brought in bad faith because brokers cannot be held liable under section 17.49(i) of the DTPA. It asserts that the two exceptions to the broker exemption upon which cross-appellees rely do not apply here.

The Texas Business and Commerce Code exempts from the DTPA "a claim against a person licensed as a broker or salesperson under Chapter 1101, Occupations Code, arising from an act or omission by the person while acting as a broker or salesperson." TEX. BUS. & COM. CODE ANN. § 17.49(i). Subsection (i) states that the exemption does not apply to:

> (1) an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion;
>
> (2) a failure to disclose information in violation of Section 17.46(b)(24); or
>
> (3) an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion.

*Id.* A failure to disclose information in violation of section 17.46(b)(24) means "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed . . . ." *Id.* § 17.46(b)(24).

## 1. Section 17.49(i)(2) Exception

According to C&W, the exception to the broker-exemption under section 17.49(i)(2) does not apply because Nwokedi and Tsang did not fail to disclose their conflict to cross-appellees. They assert that while cross-appellees might be unhappy with the timing of Nwokedi's disclosure, there is no question that he did, in fact, disclose his dual roles.

67

Cross-appellees argued below that the exception under section 17.49(i)(2) applied because the brokers signed the Listing Agreement stating they were acting in cross-appellees' best interest but failed to disclose for months afterwards that they were negotiating behind the scenes against cross-appellees to buy the property and business they were selling as cheaply as possible. They asserted that although Nwokedi eventually disclosed to them in April 2018—a few months before the sale—that he would own a minority interest in the business, he did not tell them he had been working with the buyer for months to negotiate the sale at a reduced price. In his sworn declaration dated April 7, 2022, Travis stated:

> If Edward Nwokedi had disclosed to us that he had a conflict of interest, in that he had been working with Cyril Chiosa from the beginning to not only sell the Arms Room but also purchase it for himself at a reduced price, I would have advised my mother not to sign the Listing Agreement and engage him as our agent. My mother relied on my advice during this process and, with my recommendation, she would not have signed the Listing Agreement.

> Edward Nwokedi's failure to disclose his conflict of interest at the beginning would have had a significant impact on our decision-making regarding the sale of the Arms Room. My perception of the market and that there were no other potential buyers for the Arms Room was based on my belief that Nwokedi was acting in good-faith, and without conflict, to locate potential buyers for the Arms Room and to secure the best possible deal. Had I known the extent and length of time of [] Nwokedi's conflict of interest, I would not have agreed to the terms of the Purchase Agreement for the Arms Room.

The evidence that Nwokedi failed to disclose the brokers' conflict of interest between August 2017 and April 2018 belies C&W's assertion that cross-appellees'

68

DTPA claim was groundless or brought in bad faith because their claim was barred under section 17.49(i) and the exception under section 17.49(i)(2) is not applicable.

## 2. Section 17.49(i)(3) Exception

C&W asserts that the exception under section 17.49(i)(3) to the broker-exemption does not apply because C&W did not engage in an unconscionable action or course of action.

The DTPA defines "unconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id.* §17.45(5); *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998). "This should be determined by examining the entire transaction and not by inquiring whether the defendant intended to take advantage of the consumer or acted with knowledge or conscious indifference." *Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex. 1985). To prove an unconscionable action or course of action, a plaintiff must show that the defendant's acts took advantage of his lack of knowledge and "that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Id.* at 584. A court examines the entire transaction to determine whether a defendant took advantage of a consumer to a grossly unfair degree, and a plaintiff need not prove reliance to establish a claim based on unconscionability. *Mays v. Pierce*, 203 S.W.3d 564, 572 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Cross-appellees argued below that the brokers engaged in unconscionable actions when they failed to notify cross-appellees of the extent of their conflict of interest and for how long they had intended to purchase The Arms Room. They asserted that the brokers also acted unconscionably when they secretly organized the holding companies so that CEL actually had no stake in the realty and then defrauded Travis of $800,000 in exchange for $75,000 worth of ownership in the operating entity instead of the stake to which the parties had agreed.

In its briefing, C&W asserts that cross-appellees "allege[d] that C&W presumably engaged in an unconscionable act by cutting James out of a 15% ownership arrangement in a newly formed company." C&W argues that this action has nothing to do with C&W but rather stems from a dispute by and among the founders of CEL, which include Nwokedi, Tsang, Chiosa, and James, not C&W.[22] We agree with C&W that the allegedly unconscionable action in misleading James about the nature of his ownership interest does not involve C&W. However, the additional ground asserted by cross-appellees—that the brokers failed to notify cross-appellees of the extent of their conflict of interest and the length of time they had intended to purchase the Arms Room—is supported by some evidence that the

---

[22]    C&W's summary judgment motion did not address cross-appellees' additional complaint that the brokers engaged in unconscionable action when they failed to notify cross-appellees of the extent of their conflict of interest and how long they had intended to purchase the Arms Room.

70

brokers took advantage of cross-appellees' lack of knowledge to a grossly unfair degree. *See Morris*, 981S.W.2d at 677; *Mays*, 203 S.W.3d at 572.

The trial court did not err in rendering a take-nothing judgment against C&W on its DTPA counterclaim. We overrule C&W's cross-appellate issues.

## Conclusion

We affirm and reverse in part. We reverse the portions of the trial court's final judgment granting summary judgment in favor of (1) Edward Nwokedi and Cyril Chiosa on the Jameses' fraud claim; (2) Edward Nwokedi and Cyril Chiosa on the Jameses' claim of negligent misrepresentation; (3) Cushman & Wakefield of Texas, Inc. on the Jameses' negligent hiring and supervision claim; and (4) Cushman & Wakefield of Texas, Inc., Edward Nwokedi, and Cyril Chiosa, on the James's civil conspiracy claim, and we remand those claims to the trial court for further proceedings consistent with our opinion. We affirm all other aspects of the trial court's final judgment granting summary judgment in favor of appellees and the final take-nothing judgment in favor of the Jameses on C&W's counterclaim for attorney's fees under the DTPA.

Kristin M. Guiney
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.

71